CLERK'S OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED

DEC 0 9 2005

JOHN F. CORCORAN, CLERK
BY: /s/
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | |
|---|---|
| SUE E. MAWYER,<br><br>*Plaintiff,*<br><br>v.<br><br>JO ANNE B. BARNHART,<br>Commissioner of Social Security<br><br>*Defendant.* | CIVIL ACTION NO. 3:04CV00083<br><br>MEMORANDUM OPINION<br><br>JUDGE NORMAN K. MOON |

This matter comes before the Court on appeal from the final decision of the Commissioner, which denied the Plaintiff's July 31, 2002 claim for a period of disability, disability insurance, and supplemental security income benefits under the Social Security Act (Act), as amended, 42 U.S.C. §§ 416, 423, and 1381 *et seq*. The Plaintiff appealed the Commissioner's denial of disability benefits, filing a complaint with this Court on October 15, 2004. This matter was referred to United States Magistrate Judge B. Waugh Crigler for proposed findings of fact, conclusions of law, and a recommended disposition. *See* 28 U.S.C. § 636(b)(1)(B). Both the Plaintiff and the Commissioner filed motions for summary judgment. In his Report and Recommendation of August 26, 2005, the Magistrate recommended that this Court reverse the Commissioner's final decision, granting judgment to the Plaintiff, and recommitting the case for the sole purpose of calculating and paying proper benefits. The

Commissioner has filed timely objections to the R&R, making this case ripe for determination.

## I. Facts

The Plaintiff, Sue B. Mawyer, is a 52 year old woman who filed for Social Security disability benefits in July of 2002, claiming that she was unable to work due to her bipolar affective disorder ("BPAD"). Plaintiff previously worked as a certified nursing assistant for 23 years. However, due to the stress of that job, she switched to work as a custodian doing cleaning, which she did full time until April, 2002. Since then, she has only worked part time, cleaning residences once or twice a week for a few hours each time, earning approximately $50 per week. She claims that she is unable to do more because of her BPAD.

The Plaintiff's struggle with BPAD is well documented and goes back well before her application for Social Security benefits. In May, 1995 she went through intake at the Department of Psychiatric Medicine at the University of Virginia and was discharged from treatment on March 16, 1999 due to non-compliance with followup. On October 30, 1999, Plaintiff went back to the Department of Psychiatric medicine and was diagnosed with BPAD and prescribed medication. The Plaintiff was admitted to the hospital on April 17, 2002 for suicidal thoughts and was discharged on May 10, 2002. On June 9, 2002, the Plaintiff went to the emergency room at the University of Virginia for depression and suicidal ideation and was admitted to the hospital. From this point on, the Plaintiff received regular treatment for BPAD, and her experiences during this time are described in detail in her medical records. If a broad outline of her condition since then can be made, it is that her mood varied from better to worse, often including bouts of severe depression. She often reported feeling sadness, depression, crying spells, decreased energy, and paranoia, sometimes rendering her unable to get out of bed for days

2

at a time.

A brief survey of the Plaintiff's conditions at various times after her June 9, 2002 admission to the hospital illustrates the types of symptoms she suffers as well as their often fluctuating severity. On July 10, 2002, Dr. Anita Clayton at the University of Virginia described the Plaintiff's mood as down and her affect subdued and dysphoric. On July 24, 2002, Dr. Clayton described the Plaintiff as sad and near tears. On July 31, 2002 the Plaintiff was anxious and paranoid, although somewhat improved in other respects. On August 7, 2002, the Dr. Clayton reported increased crying episodes as well as anxiety and daytime fatigue. On September 4, 2002, the Plaintiff was tearful and angry, although on September 11, 2002 she reported mild improvements. On September 25, 2002, the Plaintiff reported that her mood went up and down and that she felt overwhelmed by minor events and unable to work. On October 30, 2002 she reported feeling bad, while a week later she reported feeling somewhat better. This general pattern of peaks and troughs continued over the next several months. On April 9, 2003 she felt better, although just a week later she felt overwhelmed again. On July 23, 2003 the Plaintiff reported anxiety and finding difficulty in motivating herself to work, but on July 30, 2003 her mood was improved. However, by late August of 2003, the Plaintiff reported increased depression, decreased energy, and several days of feeling unable to get out of bed. A couple of days before Hurricane Isabel hit in September of 2003, she spent an entire day crying and feeling terrified at the news reports of the coming storm. On October 22, 2003 the Plaintiff was again depressed and on November 5, 2003 reported crying spells and worsening depression.

In terms of her daily life, the Plaintiff works once or twice a week cleaning houses for a couple of hours. She lives at home with her elderly, invalid mother. She prepares her own meals

3

and the evening meal for her mother and cleans the house. However, she does not do the grocery shopping because it makes her nervous. A sister comes by four to five times a week to help take care of her mother. She has almost no social life and mostly stays at home, sometimes staying in bed from Friday to Monday.

The Plaintiff saw the Commissioner's consulting psychologist, Dr. Daniel McClure, on October 25, 2002. He characterized her mood as agitated and depressed. He described her insight and judgment as adequate, although quite impaired during her times of mania. He diagnosed her with BPAD, post traumatic stress disorder, and depressive disorder at Axis I and a dependent personality disorder at Axis II. He also gave her a GAF of 55, which indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.

The Plaintiff began seeing Dr. Michael Murphy, a resident physician at the University of Virginia, on a weekly basis beginning on July 9, 2003. Her treatment records with Dr. Murphy reveal the same up-and-down cycles as before. On some weeks she reported feeling better and more energetic, although on other weeks she reported feeling depressed to the point of spending several days in bed. On September 8, 2003, Dr. Murphy filled out a Mental Limitations Assessment form. He indicated her limitations as marked (a serious limitation, such that performance would be unsatisfactory) or extreme (a severe limitation with no useful ability to function) in the following areas: (1) ability to carry out short and simple instructions throughout an eight hour workday; (2) ability to maintain customary work pace and complete tasks in timely manner throughout an eight hour workday; (3) ability to adhere to a schedule throughout an eight hour workday without special supervision; (4) ability to sustain an ordinary work routine throughout an eight hour workday without special supervision; (5) ability to work in coordination

4

with or in proximity to others throughout and eight hour workday without being distracted by them; (6) ability to make simple work-related decisions consistently throughout an eight hour workday; (7) ability to maintain regular work attendance on a full-time basis, without absence of more than two days per month; (8) ability to tolerate ordinary work stresses without decompensation in work performance throughout an eight hour workday; (9) ability to respond appropriately to challenges in the work setting; (10) ability to accept instructions and respond appropriately to criticism from supervisors; (11) ability to get along with coworkers throughout an eight hour workday; and (12) ability to travel in unfamiliar places or use public transportation. He described her depression as moderate with potential to become severe and described her as having poor frustration tolerance and impaired coping skills. However, with few exceptions, his weekly mental status exams of her report her as having fluent speech, full affect, linear thought processes, no hopelessness, no perceptual disturbances, good judgment, and good impulse control. Dr. Murphy's weekly reports also show that her memory and concentration were consistently good, while her anxiety, sleep, and energy levels fluctuated.

In contrast to the opinion of Dr. Murphy, Dr. Cerkevitch, a non-treating, non-examining DDS physician, found the Plaintiff to be much less limited. Dr. Cerkevitch found that the Plaintiff was not markedly limited in any of the areas considered, including understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Cerkevitch found no evidence that the Plaintiff had any limitation with respect to these latter two categories and found the same for most of the subparts of the sustained concentration and persistence category.

**II. The ALJ's Opinion**

5

While the ALJ found that the Plaintiff suffered from severe BPAD, he also found that she possessed the residual functional capacity to perform both light and medium unskilled work and determined that her past relevant work did not require activities beyond her capacities. Specifically, he found that the Plaintiff had no limitations in her ability to understand, remember, or carry out short and simple instructions and had only moderate limitations in her ability to understand, remember, and carry out detailed instructions. The ALJ then determined that the Plaintiff was capable of returning to her past relevant work as a custodian and nurses aide. Consequently, the ALJ concluded that the Plaintiff was not under a disability as defined by the Social Security Act.

The ALJ based this finding on three grounds. First, he did not find entirely credible the Plaintiff's testimony that she was not able to return to work full-time. He cited the fact that she maintains a home for herself and her aged mother. Also, he cited a supposed discrepancy between her testimony of December 1, 2003, when she stated that she does not do grocery shopping or go to church anymore, and the November, 2002 statement of the Plaintiff's friend, Sandra Henderson, that she does do grocery shopping and tries to go to church. Second, he gave little weight to Dr. Murphy's opinion that her limitations were marked or extreme in certain areas. His reasons for discounting Dr. Murphy's testimony were that his own notes and the rest of the record contradicted his conclusions about the Plaintiff's limitations. As an example, the ALJ pointed out that Dr. Murphy noted that she was feeling better in November, 2003 and that her judgment and impulse control were good. Third, after discounting the evidence presented by the Plaintiff and Dr. Murphy, the ALJ adopted the view of Dr. Cerkevitch, claiming that it was in line with the better mood that the Plaintiff reported in November, 2003.

In reaching his conclusion that the Plaintiff was capable of returning to her past relevant work, the ALJ relied on the testimony of Dr. Earl Glosser, the Commissioner's vocational expert. During the hearing, the ALJ questioned Dr. Glosser about what kinds of work the Plaintiff was capable of returning to. Dr. Glosser testified that assuming an individual of the Plaintiff's age and education diagnosed with a bipolar disorder and limited to the extent outlined by the DDS physician, it would be possible to return to the work formerly done by the Plaintiff. However, when asked to assume an individual limited to the extent detailed in Dr. Murphy's assessment, Dr. Glosser testified that he could not imagine such a person being able to do any work at all on a sustained basis. Since the ALJ gave the Dr. Cerkevitch's assessment greater weight than that of Dr. Murphy, he went on to conclude that the Plaintiff could return to her past relevant work. Accordingly, he found that she was not disabled under the Social Security Act.

The Appeals Council denied the Plaintiff's request for review and the Plaintiff appealed, bringing the matter before this Court.

### III. Discussion

Review of a final decision of the SSA concerning disability benefits pursuant to 42 U.S.C. § 405(g) is limited to two determinations: (1) whether the SSA's findings of fact are supported by substantial evidence; and (2) whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."

Hays, 907 F.2d at 1456. Thus, the Court must not review the factual findings of the

7

Commissioner *de novo* by weighing evidence or substituting its own judgment for that of the Commissioner, so long as the Commissioner's decision is supported by substantial evidence. *Id.*

The Plaintiff contends that the ALJ's findings are not supported by substantial evidence for three reasons. First, the Plaintiff argues that substantial evidence does not support the ALJ's determination that her claim of total inability to work was not credible. Second, the Plaintiff takes issue with the ALJ's finding that Dr. Murphy's evaluation is contradicted by the rest of the record and his own notes. She contends that because there is not substantial evidence to support the ALJ's position, Dr. Murphy's evaluation must be given controlling weight. Third, the Plaintiff argues that the ALJ's heavy reliance on Dr. Cerkevitch's report, to the exclusion of almost all other medical evidence, is too selective and does not provide substantial evidentiary support for his opinion.

Having thoroughly considered the matter, the Court agrees with the Plaintiff that the ALJ's determination as to her ability to return to work is not supported by substantial evidence in this case. First, the Court disagrees with the ALJ's finding that the Plaintiff's claims of disability lack credibility. The Court finds inadequate his assertion that her claim of inability to work is not credible because she prepares meals, cleans the house, and assists in caring for her mother. While each of these facts is true, they do not cast doubt on her claim of disability when viewed in the appropriate context. The record, after all, shows that even though she does these things, her sister still comes over five times a week to look after the mother; she does not do any of the grocery shopping due to being nervous around people in the grocery store; she has stopped going to church due to her depression; she sometimes stays in bed for days at a time; and she suffers from anxiety and crying spells. The fact that she does a few limited things around the house does

8

not put in doubt her credibility when it comes to not being able to work eight hours a day, five days a week.

The ALJ also cites what he characterizes as discrepancies between her December 1, 2003 testimony and the November, 2002 statements of her friend Sandra Henderson. In November of 2002, Henderson stated that the Plaintiff did grocery shopping once or twice a week and tried to go to church twice a week. The ALJ finds the Plaintiff to lack credibility because on December 1, 2003 the Plaintiff testified that she did not do grocery shopping and had stopped going to church a few months back. The Court does not find Henderson's statements to be substantial evidence of the Plaintiff's lack of credibility. The comments about going to church are not even contradictory and the fact that the Plaintiff did grocery shopping in 2002 does not cast doubt on her claim, over a year later, that she did not do grocery shopping as of December 2003.

The Plaintiff's assertion that the ALJ improperly decided to not give Dr. Murphy's assessment controlling weight is somewhat closer, although the Court ultimately agrees with the Plaintiff. Pursuant to 20 C.F.R. § 404.1527, the SSA will give controlling weight to the treating physician's opinion if it is "well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. The Plaintiff maintains that Dr. Murphy's opinion that the Plaintiff had numerous marked or extreme limitations is not inconsistent with substantial evidence in the record and that, therefore, the ALJ erred in not giving it controlling weight. The Court agrees that ALJ's claim that Dr. Murphy's opinions contradict the record is not supported by the evidence. For example, the ALJ's remark that Dr. Murphy's bleak assessment of her limitations contradicted the more upbeat mood he reported her having in November 2003 is particularly unpersuasive. Given the

nature of BPAD and the Plaintiff's history of ups and downs, it is hardly surprising that she might have felt better during one particular month. The only way in which his own notes could possibly be seen to contradict his assessment of her limitations is in the fact that he consistently reported her as having fluent speech, full affect, linear thought processes, no hopelessness, no perceptual disturbances, good memory, good judgment, and good impulse control. However, having good memory, good judgment, and fluent speech does not necessarily contradict Dr. Murphy's opinion that she could not sustain an eight hour work day because the nature of her impairment is a bipolar disorder, not poor memory or judgment. Thus, the Court finds that Dr. Murphy's evaluation does not contradict other substantial evidence and that the ALJ erred in not giving it controlling weight.

Finally, the Plaintiff contends that the ALJ's opinion is unsupported by substantial evidence because it relies on the assessment offered by Dr. Cerkevitch to the exclusion of almost all other medical evidence in the record. The Court finds this criticism to be persuasive. Standing alone, Dr. Cerkevitch's report does not provide substantial evidence to support the ALJ's findings because the report is nothing more than a bare checklist provided by a non-treating, non-examining DDS physician.[1] Moreover, the report's conclusion that there is no evidence that the Plaintiff suffers from any limitation in the areas of social interaction, adaptation, and most subparts of sustained concentration and persistence is at odds with the Plaintiff's well-documented troubles with her bipolar disorder. To cite only this report and Dr. Murphy's notes about the Plaintiff feeling better in November of 2003 is unduly selective and

---

[1] To be sure, Dr. Murphy's limitations assessment was in the form of a checklist as well. However, the Court finds that its credibility is bolstered by the fact that he was the Plaintiff's treating physician and that it is consistent with his own notes.

10

does not provide substantial evidence for the ALJ's findings. *See Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir. 1984) (where the only evidence supporting the ALJ's determination that the claimant was capable of light work was that of a non-examining, non-treating physician whose report was contradicted by the claimant and the diagnoses of examining and treating physicians, such a finding was not supported by substantial evidence).

Having concluded that the ALJ's findings are not supported by substantial evidence, the Court must determine the issues to be decided on remand. Social Security Administration regulations establish a five-step "sequential evaluation process" to determine whether a claimant is disabled. 20 C.F.R § 404.1520. The ALJ's analysis stopped at the fourth step when he concluded that the Plaintiff could return to her past relevant work and, therefore, was not disabled. Normally, a finding by a district court that the ALJ erred at this level would result in a remand so that the Commissioner could decide whether to award benefits or conduct supplemental proceedings at the final level of the process, where the Commissioner would have the burden of establishing the availability of jobs to the plaintiff. However, the hearing conducted by the ALJ proceeded into the fifth step of the sequential evaluation process when the vocational expert testified that an individual limited to the extent detailed in Dr. Murphy's evaluation would not be able to do any work at all on a sustained basis. The Court finds that this renders it unnecessary to remand on the issue of the availability of other work. Because the Commissioner's own expert testified that an individual with limitations described by Dr. Murphy would be unable to find any work, the Court is convinced that any determination to the contrary by an ALJ would be incapable of withstanding judicial review. *See Coffman v. Bowen*, 829 F.2d 514, 519 (4th Cir. 1987); *Millner v. Schweiker*, 725 F.2d 243, 246 (4th Cir. 1984). Thus, the

Court will recommit the case for the sole purpose of calculating and paying proper benefits.

## IV. Conclusion

For the reasons stated above, the Court finds that the Commissioner's decision that the Plaintiff could return to her past relevant work was not supported by substantial evidence. Accordingly, the Court will grant judgement to the Plaintiff, deny the Commissioner's Motion for Summary Judgment, overrule the Commissioner's objections, and adopt the Magistrate's Report and Recommendation in its entirety. The Commissioner's decision, therefore, shall be reversed and remanded for further proceedings for the purpose of calculating and paying proper benefits.

An appropriate order this day shall issue.

ENTERED: _____
United States District Judge

12/9/05
Date